UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 2:19-cr-223(1) |
| | : | |
| Plaintiff, | : | CHIEF JUDGE MARBLEY |
| v. | : | |
| | : | |
| JOSE ROSALES-OCAMPO, | : | GOVERNMENT'S SENTENCING MEMORANDUM |
| | : | |
| Defendant. | : | |

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Defendant Jose Rosales-Ocampo ("Defendant" or "Jose Rosales"). For the reasons set forth herein, the United States recommends 168 months of imprisonment, followed by three years of supervised release, a sentence falling within the properly calculated guideline range after all departures are considered.

**I.    Factual Background**

Beginning in or around 2013, and continuing through in or around September 2019, Defendant, along with his co-defendants, and others, conspired to commit the crimes of narcotics distribution and large-scale money laundering related to drug trafficking proceeds, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 1956(h). The money laundering and drug trafficking schemes relied on the use of small businesses that held themselves out as cell phone stores. The stores sold few, if any, cell phones, and they conducted little, if any, legitimate business otherwise. Rather, the stores were merely front businesses for drug traffickers to send large amounts of money related to their drug trafficking activities from the Southern District of Ohio to Mexico. The stores did so through a large volume—tens of thousands during the course of the conspiracy—of wire transfers structured to conceal the nature of the money as drug proceeds and evade federal and corporate reporting requirements. There were at least three such stores in the Columbus area used in the

conspiracies. Jose Rosales owned and operate Los Rosales, located at 1028 Shady Lane Road in Columbus, Ohio. All told, during the time period of the conspiracy, the three stores comprising the JOSE ROSALES Money Laundering Organization (hereinafter, the "JOSE ROSALES MLO") laundered approximately $44,000,000 in narcotics proceeds. For context, two of the many narcotics-trafficking cells the JOSE ROSALES MLO assisted here in the Southern District of Ohio included the remaining co-defendants in this case—one cell comprised of Eliezar Mendoza-Nava ("Mendoza-Nava") and Rodrigo Esqueda-Vazquez ("Esqueda-Vazquez"), and another of Julio Angel Homer Gonzalez ("Gonzalez") and Rodolfo Franco-Valdez ("Franco-Valdez").

The JOSE ROSALES MLO conducted its illegal wire-transferring activities using several methods to set up the operations of the stores and conceal the nature of what each store, and the MLO overall, was doing. The JOSE ROSALES MLO did so in part by failing to follow requirements related to information associated with each wire transfer. In the course of a normal, law-abiding relationship between agent store and a Money Service Business ("MSB"), individual customers seeking to use money transmission services would bring currency to an MSB agent location. That location would be connected to an MSB via a computer terminal. The MSB agent location could then collect the funds, along with certain information from the customer, such as the sender's name, address, and telephone number. The customer would also be required to provide the name of the beneficiary (recipient), as well as the beneficiary's city, state, and country.

This is not how things happened at Los Rosales, or at any of the other stores in the conspiracy. Instead, at the JOSE ROSALES MLO agent locations, the customer provided only some of this information directly to an employee, to include Defendant, who then entered the information into the MSB computer system. That is, when members of the drug trafficking organizations would stop in to the stores to drop off the bulk narcotics proceeds, the drug traffickers, or someone affiliated with them, would provide the JOSE ROSALES MLO with lists

2

of names.  The names on these lists were the intended beneficiaries of the wire transfers in Mexico. The JOSE ROSALES MLO would then send the narcotics money to the names on the lists they were provided.  Although they were required by the Bank Secrecy Act ("BSA") and by the MSBs' own anti-money laundering rules to provide the names and identifying information of the senders of the money, the JOSE ROSALES MLO did not do so.  Instead, they knowingly falsified sender names, sender addresses, and sender phone numbers, all for the purpose of concealing the nature of the money and the illegal conspiracy.

     Jose Rosales and the other stores in the JOSE ROSALES MLO took additional steps to obscure their illegal conduct and conceal the nature of the money they were sending.  For example, Mexican drug trafficking organizations would routinely drop off bulk amounts of narcotics proceeds, in the form of U.S. currency. The amounts of this bulk currency could be as much as $100,000.  Federal law and MSB rules restricted the amount that an MSB agent store could transfer without further paperwork or questioning.  Jose Rosales and his co-conspirators, therefore, intentionally structured the wire transfers by splitting the bulk amount into smaller amounts in order to evade detection from the MSBs' internal compliance programs and to avoid Bank Secrecy Act reporting requirements.  The stores in the JOSE ROSALES MLO would also share bulk cash with one another in order to facilitate quicker and more clandestine transfers of the cash.  Together, the stores would structure the transfers so that each individual wire would be for an amount between $500 and $1,000.  The stores further charged a fee of $20 to $50 per $1,000 transferred— a fee that was higher than any of the fee figures the MSB transferring services required its agents to impose.  And, on occasion, after receiving large sums of cash from drug traffickers, Defendant, as well as Thania Rosales, Dulce Rosales, and Josue Gama, also spread out the timing of the monetary wire transfers, which meant processing the transactions when these customers were not present in direct violation of the training received from the MSBs.

Once the monetary wire transfer was complete, Defendant and his co-conspirators in the JOSE ROSALES MLO would use text messages, or applications such as WhatsApp, to communicate with the drug traffickers in the Southern District of Ohio and in Mexico in order to update them on the status of the transfers. The JOSE ROSALES MLO would also send photos of the transfer receipts to the drug trafficking organizations. Rather than send the entire receipt, the JOSE ROSALES MLO altered receipts, which removed the name of the MSB agent, i.e. the JOSE ROSALES MLO stores and the MSB used for the monetary transfer. Each member of the JOSE ROSALES MLO also took responsibility for depositing the cash received from these customers into designated bank accounts for the purposes of paying the MSBs that transmitted the funds to agent locations in Mexico.

As one example of how the conspiracy played out, Mendoza-Nava and Esqueda-Vazquez were arrested in the Columbus area on December 4, 2018. During contemporaneous searches of their associated houses and residences, law enforcement uncovered no less than 6 kilograms of a substance containing a detectible amount of heroin, as well as large quantities of materials associated with drug trafficking. Mendoza-Nava and Esqueda-Vazquez were two of the JOSE ROSALES MLO's most active drug trafficking customers. When they were eventually arrested, Mendoza-Nava and his associate and co-defendant, Esqueda-Vazquez, were found with various lists at the time of their arrests. The lists, which contained numerous names, all related to illegal wire transfers. One such list was found during the arrest of Esqueda-Vazquez. The names on the list that contained eight names were compared with wire transfers from the three stores known to be members of the JOSE ROSALES MLO. This comparison revealed that all of the names on the list were intended as beneficiaries of wire transfers from Los Rosales on November 13, 2018. Further, these eight wire transfers were initiated in under an hour and utilized three different wire transfer services.

Los Rosales, the store of Jose Rosales, also performed transfers for co-defendants Julio Angel Homer-Gonzalez and Rodolfo Franco-Valdez, both of whom were arrested in September of 2018. At the time of their arrest, contemporaneous searches of their associated houses and residences uncovered no less than 76 grams of a substance containing a detectible amount of fentanyl. Also located during the searches were numerous calendars and handwritten notes that detailed dates and names related to illegal wire transfers initiated by JOSE ROSALES at Los Rosales to beneficiaries in Mexico from Gonzalez and Franco-Valdez.

This is not the total extent of Jose Rosales's involvement in the conspiracy, by any means. As the PSR lays out, Rosales acted as a manager or supervisor of the MLO. As part of owning and operating his own store, he made decisions regarding numerous money-transmitting application processes, certifications, and filings related to Los Rosales. Some of the certifications acknowledged his knowledge of anti-money laundering procedures and regulations along with his affirmation to operate lawfully. In addition, he recruited his daughter and co-defendant, Thania Rosales-Guadarrama, as well as trained, and oversaw the development and operation of Dulce and Thania Rosales-Guadarrama's stores. As for his own transfers, in total, from approximately 2013 until his arrest in the fall of 2019, Defendant, through Los Rosales, initiated thousands of wire transfers to Mexico of drug proceeds on behalf of multiple drug trafficking organizations, all in amounts between $500 and $999, and all totaling more than $25 million.

**II.     Procedural History**

On October 17, 2019, a federal grand jury returned an 89 count Indictment charging Jose Rosales, among others, with: Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; and Conspiracy to Possess with Intent to Distribute 1 Kilogram or More of Heroin, in violation of 21 U.S.C. § 846. On June 24, 2020, Defendant pleaded guilty to Count 1 of the Indictment, which

5

charged Conspiracy to Commit Money Laundering. He did so pursuant to a Rule 11(c)(1)(B) Plea Agreement and the attached Statement of Facts.

### III. Sentencing Guidelines Calculation

#### a. Statutory Maximum Sentence

The maximum sentence for Conspiracy to Commit Money Laundering is 20 years' imprisonment, a $500,000 fine, a three-year period of supervised release, and a $100 special assessment.

#### b. Sentencing Guidelines Calculation

In imposing a sentence, the Court must take into account the considerations of sentencing set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). As the Presentence Investigation Report ("PSR") correctly calculates: the base offense level is **30** pursuant to U.S.S.G. § 2S1.1(a)(2); there is a **6**-level increase because the defendant knew the laundered funds were the proceeds of distributing narcotics pursuant to U.S.S.G. § 2S1.1(b)(1); there is a **4**-level increase because the defendant was in the business of laundering funds pursuant to U.S.S.G. § 2S1.1(b)(2)(C); there is a **3**-level because the defendant was a leader and organizer in the MLO pursuant to U.S.S.G. § 3B1.1(b); and finally, there is a **3**-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). These calculations result in a total adjusted offense level of **43**. Defendant is a Criminal History Category I, which, at an offense level **40**, corresponds to a guideline range of 292–365 months, before any departures are considered. The statutory maximum sentence for Defendant's offense of conviction is 240 months, pursuant to 18 U.S.C. § 1956(h).

In his sentencing memorandum, the Defendant notes some level of dissatisfaction with these calculations. But, as he himself says, there are no objections to these calculations, and the Defendant's contentions about the calculations require little response, outside of two points. First, counsel for Defendant contends that the 4-level increase based on the Defendant being in the business of laundering funds is misapplied because the Defendant did some legitimate business during the conspiracy. Even if this were true, the 4 points were still properly assessed. Beyond this, the substantial majority (almost of all, in fact) of the Defendant's business was tied to drug-money laundering. And second, counsel for Mr. Rosales notes that the Defendant's offense level is on par with other serious offenses. The Government agrees. The Defendant oversaw a money laundering operation that laundered no less than $44,000,000 in drug money out of the country. This is a serious offense.

### IV.     The Proper Sentence

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

*The Nature and Circumstances of the Offense.* In the world of drug trafficking, crime pays so long as there are people willing to conceal the nature of drug proceeds and ensure their undetected transfer back to drug trafficking organizations for future use. Unfortunately, Jose Rosales was willing to be that person, and he was willing to recruit, and oversee, others—including his daughters, Thania Rosales-Guadarrama and Dulce Rosales-Guadarrama, and his son-in-law, Josue Gama-Perez—in the execution of his criminal conduct. He was willing, that is, to ensure that drug trafficking organizations from Mexico could continue to prey on the vulnerable and addicted in the United States. Moreover, despite training in the legal ways of wire transfers, Jose Rosales and his co-conspirators broke all the rules: they structured the amount of transactions to avoid reporting requirements, falsified sender information, structured the timing of transactions to avoid detection, shared bulk cash between the stores to process smaller transactions more quickly, and conducted wire transfers without the customer present. Knowing the value that Jose and his co-conspirators brought to the drug trafficking business, they also charged a higher fee for sending drug proceeds back to Mexico than a legitimate wire transfer.

All told, over a more-than five year period, Jose Rosales, through Los Rosales, laundered more than $25 million in drug proceeds for international drug traffickers. Altogether, the JOSE ROSALES MLO, including Defendant's store, laundered more than $44 million in drug proceeds to Mexico.

*The History and Characteristics of the Defendant.* Jose Rosales reports being born in Mexico in 1963, with his father unfortunately being murdered in 1970, and his mother dying much later in a car accident. He came to the United States when he was 22 in search of employment. He has three children, including co-defendants. Part of Jose Rosales's story is admirable—namely, that he was able to come to the United States and attempt to make a life for himself here through hard work. But much of it, at this point, is deeply unfortunate. He had the wherewithal to start

8

his own business, recruit others, and oversee others—all, unfortunately, to knowingly launder drug proceeds to his financial benefit. Therefore, while he does have a challenging past and part of his story does reflect the drive to come to America to work hard, it does not detract from the need to impose a significant sentence in this case.

***To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.*** The recommended sentence contemplates the seriousness of the offense, which cannot be understated for its role in contributing to the ongoing influx of drugs in the United states; and seeks to promote respect for the law, which reflects an attempt to punish not only those that actually engage in drug trafficking, but also those that make the business of drug trafficking possible through money laundering. Finally, the proposed sentence reflects a just punishment for Jose Rosales specifically and the leadership role he played in the offense.

***The Need to Afford Adequate Deterrence to Criminal Conduct.*** The Court must also consider the need for the sentence imposed to afford adequate deterrence to criminal conduct—both general and specific. Money laundering is vital to the success of a criminal operation—without access to proceeds, and the appearance of a legitimate source of income, drug trafficking organizations cannot flourish. Here, the Government respectfully submits that the recommended sentence is necessary to serve not only as a deterrent to Jose Rosales, but to others who may justify or rationalize their involvement with the laundering of drug proceeds as just a series of financial transactions. Again, crime can always pay, especially if money launderers just raise their fees for performing the same kind of services Jose performed here. The sentence imposed in this case should therefore send a message of deterrence to anyone who thinks merely raising the fees is worth it in order to take the risk of facilitating large-scale drug trafficking in the Southern District of Ohio.

*Forfeiture*. There is no restitution owed in this case. However, the United States respectfully requests that the Court order the forfeiture of the items outlined in Forfeiture Allegations A and B contained within the Indictment and Plea Agreement.

### V. Conclusion

For the reasons set forth above, the United States respectfully recommends that Defendant Jose Rosales-Ocampo be sentenced to 168 months of imprisonment, followed by three years of supervised release. The Government submits that this sentence is sufficient but not greater than necessary to satisfy the statutory purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

*s/S. Courter Shimeall*
S. COURTER SHIMEALL (OH 0090514)
JESSICA W. KNIGHT (0086615)
Assistant United States Attorneys
DANIEL J. STANLEY (OH 0079799)
Special Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
Email: courter.shimeall@usdoj.gov
Email: jessica.knight@usdoj.gov
Email: dstanley@franklincountyohio.gov

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Government's Sentencing Memorandum* was electronically served via the Court's CM/ECF system this 7th day of October, 2020 upon counsel of record for Jose Rosales-Ocampo.

*s/S. Courter Shimeall*
S. COURTER SHIMEALL (0090514)
Assistant United States Attorney